# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* MCQUISTON, Minors.

UNPUBLISHED
June 12, 2018

No. 340743
Wayne Circuit Court
Family Division
LC No. 16-523453-NA

Before: SWARTZLE, P.J., and SHAPIRO and BOONSTRA, JJ.

PER CURIAM.

Respondent appeals by right the trial court's order terminating her parental rights to her minor children, JM and XM, under MCL 712A.19b(3)(b)(*i*) (parent caused physical injury to child), (b)(*ii*) (parent failed to prevent physical injury to child), (g) (failure to provide proper care and custody), (j) (reasonable likelihood that child will be harmed if returned to parent), and (k)(*iii*) (abuse included battery, torture, or other serious abuse). We affirm.

## I. PERTINENT FACTS AND PROCEDURAL HISTORY

JM suffers from cerebral palsy and a rare metabolic disorder called "Russell-Silver syndrome," which is a form of dwarfism. JM is unable to control the movement of his limbs and is dependent on a gastrostomy tube ("G-tube") to receive nourishment. JM and XM were removed from respondent's home after a report was made to Children's Protective Services ("CPS") following JM's admission to Children's Hospital of Michigan (CHM) for severe malnourishment. At the time of his admission, then-four-year-old JM weighed less than 12 pounds. His G-tube had been removed and its entry hole was scabbed over. CHM reported to CPS that it suspected that respondent had medically neglected and abused JM. Following a preliminary hearing held in September 2016, the trial court authorized CPS's petition to remove the children from respondent's care. The children were placed separately in nonrelative foster care.[1]

---

[1] Portions of the proceedings involving the children's putative fathers have been omitted from this summary. Respondent's husband at the time of the proceedings was not the biological, putative, or legal father of either child.

In November 2016, JM's doctors discovered evidence that he had sustained head trauma, specifically evidenced by a chronic subdural hematoma (defined as a collection of blood and fluid around the brain), that was not associated with his underlying medical conditions and could have been associated with physical abuse. At the termination hearing in January 2017, Dr. Deniz Altinok, a pediatric radiologist and neuroradiologist at CHM, testified (after being certified as an expert in radiology) that magnetic resonance imaging (MRI) tests had revealed "significant abnormalities" in JM's brain structure. The MRI showed that JM had a subdural hematoma that could not be a result of JM's Russell-Silver syndrome. Dr. Altinok testified that a subdural hematoma is typically the result of head trauma, and hypothesized that JM could have received such trauma as much as three weeks before his admission to the hospital. MRIs of JM's head from 2013 and 2014 did not show signs of a subdural hematoma.

Dr. Chaya Pitman-Hunt, the admitting physician on staff when JM was admitted to CHM, testified that, according to JM's records, he had weighed 12.76 pounds in August 2013 (at one year old) and weighed only 11.2 pounds when he was admitted to CHM (three years later). Dr. Pitman-Hunt testified that respondent had claimed that JM's G-tube had fallen out at some point after she put him to sleep the night before he was admitted to the hospital; however, the G-tube hole was scabbed over, and it was not possible for it to scab over in such a short period of time. Dr. Pitman-Hunt also testified that JM had a severe decubitis ulcer, otherwise known as a pressure sore, and that this type of injury arises when someone lies in the same position for prolonged periods of time. Dr. Pitman-Hunt also agreed with Dr. Altinok that there "wasn't . . . [a] medical explanation short of trauma for the subdural hematoma" that was found in JM's brain.

Respondent testified that during the first 18 months of JM's life, he rarely maintained a steady weight and was never more than 10 pounds during this time period; however, by the time he was 2 years old he had reached 12 pounds, and ultimately reached a weight of 18 pounds after respondent and the children moved to Michigan from Tennessee. However, she testified that JM reacted poorly to an increased G-tube feeding regimen and that his weight began to drop in 2016. Respondent testified that JM was taken to CHM in August 2016 because he had pulled out his G-tube. Respondent further testified that none of the doctors or nurses at the hospital replaced JM's G-tube, and that the hole began to close itself after two days. JM ultimately underwent surgery to reopen the G-tube hole. Respondent testified that she took JM to a pediatrician, Dr. Muhammad Al-Ado, in July 2016, and that Dr. Al-Ado recommended a follow-up appointment within the month; however, an open appointment was not available until September.

The trial court concluded that sufficient evidence existed for the trial court to exercise jurisdiction over JM and XM, and to terminate respondent's parental rights under MCL 712A.19b(3)(b)(*i*) (parent caused physical injury to child), (b)(*ii*) (parent failed to prevent physical injury to child), (g) (failure to provide proper care and custody), (j) (reasonable likelihood that child will be harmed if returned to parent), and (k)(*iii*) (abuse included battery, torture, or other serious abuse) (Tr VII, pp 68-70). The trial court found as follows:

There's a number of problems here in terms of the history . . . and the care that [JM] received. And even without the issue regarding his weight and his nutrition, I mean the subdural hematoma . . . which is reflective of—of an injury of trauma is . . . something that—whether you know I agree that we don't know

exactly when it occurred. We know it occurred sometime after the child was examined in 2014. At no time was the child out of the mother's care. Although of course until she came with Mr. Barnum, the child was in care with Mr. McQuiston and her. And we don't have an explanation as to the . . . particular trauma that led to that injury . . . suffered by [JM].

[T]here have been cases where we've terminated parental rights of both parents with only [head trauma] as an issue. That type of head trauma to a young child . . . . [W]e were told in closing . . . that everything was better in Michigan, but [JM] didn't get better in Michigan. At least until sometime after [the date of JM's removal].

I will grant mother may have thought that she was supposed to make this visit with Dr. Al Ado . . . after the gastrointestinal appointment was made, but when she found out—when she was told she was supposed to make an appointment as soon as possible . . . I think it was incumbent on her at that point . . . she should have either called the doctor back or alerted somebody that something—something had to be done . . . .

The trial court held a best-interest hearing in June 2017. Demetrius Williams, a foster care worker for JM, testified that JM had been placed in a foster home and was thriving there. While in foster care, JM's weight increased from 12 pounds to approximately 24 pounds. JM's foster parents had also enrolled him in physical, occupational, and speech therapy. Williams further testified that the foster parents were suitable caretakers for JM, and informed the trial court that he believed termination of respondent's parental rights was in JM's best interests. JM had previously been unable to speak, and could now recite his ABCs, identify people by name, and count with simple numbers. Respondent was not then able to exercise all of her supervised parenting time, because JM had been placed in a foster home in Saginaw. However, respondent was exercising parenting time when JM's foster parents were able to transport him.

Quinette Bowman, XM's foster care worker, agreed with Williams that JM was doing well in his placement. Bowman also testified that XM was thriving in foster care. At the time XM was removed from respondent's care, he lacked muscle mass in his leg and walked with a limp, and also had hearing problems. But now XM was receiving occupational therapy, physical therapy, and speech therapy and had received hearing aids. Bowman testified that respondent was regularly exercising her parenting time with XM, that there was a bond between XM and respondent, and that there were no reported issues during her visits. However, given the impressive developments that both XM and JM had made over time, Bowman agreed with Williams that it would be in the children's best interests if respondent's parental rights were terminated.

Respondent testified that she was not then employed and was financially dependent on her husband, although she had recently applied for disability benefits. She testified that she was living with her husband in a one-bedroom home. She also testified that if the trial court permitted her to retain her parental rights, she would move to Saginaw, where JM's foster parents had enrolled him in a special needs school. Respondent admitted that in the past she had

changed JM's feeding regimen without receiving medical advice and had taken JM off all medication for a year.

The trial court held that termination of respondent's parental rights was in the children's best interests, finding that JM had been "within hours of dying" when he was admitted to CHM, and noting that respondent had failed to seek a timely follow-up appointment for JM to address his weight loss issues. The court further stated:

> I've got this other evidence of non-accidental trauma. And that basically is the—I guess the euphemism for child abuse. We saw the diagnostic evidence of what happened to [JM]'s head and that's not something a child that age and that weight does to themselves.
>
> Now, did [respondent] do it . . . or did [JM's putative father] do it? I don't know. But all the evidence indicates that [the injury] happened while [JM] was in [respondent's] care. We don't have—we don't have any explanation as to that—those injuries.
>
> So this is—it's a really it's a very [sic] troubling picture here that the [c]ourt has to deal with. And I don't doubt that you're emotionally connected to your children. I just know that the evidence shows me that whatever that connection is you're not able to translate that into appropriate care for them. It's obvious anyone looking at this record would see that very clear as to [JM].
>
> Now . . . . [XM] has not had these life-threatening issues yet. Well, what happens if he does have some issues? The record in terms of what you've done or failed to do regarding [JM] is significant. I mean, it's clear and it's convincing.

The trial court terminated respondent's parental rights as described. This appeal followed. On appeal, respondent challenges only the trial court's best-interest determination and petitioner's decision not to offer reunification services; she does not challenge the trial court's determination that statutory grounds for termination of her parental rights had been proven by clear and convincing evidence.

## II. STANDARD OF REVIEW

Termination of parental rights must be ordered if the trial court finds that a statutory basis for termination has been established by clear and convincing evidence "and it finds from a preponderance of the evidence on the whole record that termination is in the children's best interests." *In re White*, 303 Mich App 701, 713; 846 NW2d 61 (2014). We review for clear error the trial court's determination regarding the children's best interests. *Id.*

Typically, "[petitioner] must prepare a case service plan, which must include . . . 'a schedule of services to be provided to the parent, child, and if the child is to be placed in foster care, the foster parent, to facilitate the child's return to his or her home or to facilitate the child's permanent placement.'" In *re Mason*, 486 Mich 142, 156; 782 NW2d 747 (2010), quoting MCL 712A.18f(3)(d). Petitioner's failure to offer reunification services when they are required may render a trial court's decision to terminate parental rights clearly erroneous.

## III. BEST-INTEREST DETERMINATION

Respondent argues that the trial court's decision to terminate her parental rights was not in the children's best interests. We disagree.

In making a best-interest determination, the trial court is required to weigh all of the evidence available. *Id*. The trial court may consider a number of factors, including:

> [T]he child's bond to the parent, the parents' parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home. The trial court may also consider . . . the parent's visitation history with the child, the children's wellbeing while in care, and the possibility of adoption. [*Id*. at 713-714, quoting *In re Olive/Metts*, 297 Mich App 35, 41-42; 823 NW2d 144 (2012) (quotation marks and citations omitted).]

Here, the trial court found that termination was in the children's best interests based on respondent's medical neglect of JM, as well as the fact that he had a subdural hematoma that could only have been caused by physical trauma. The trial court observed that by the time JM was taken to the hospital in August 2016, he was nearly dead from malnutrition. The trial court also noted that respondent almost entirely neglected JM's medical needs before taking him to the hospital, despite the fact that she had been advised to follow up with a doctor as soon as possible in order to address JM's special medical needs and rapidly decreasing weight.

JM was approximately 12 pounds when the petition for termination of parental rights was filed against respondent. JM had cerebral palsy and Russel-Silver syndrome. JM's G-tube had likely been displaced for at least several days before respondent took him to the hospital, given that the G-tube entry hole had scabbed over. Respondent consistently moved both children from place to place, which disrupted any sense of normalcy or stability for the children. Additionally, XM exhibited untreated medical issues of his own.

The trial court considered the fact that both JM and XM were thriving in their foster placements. The children's special needs were being addressed and both children were making significant progress with overcoming or adapting to their medical conditions. Further, although not referenced by the trial court, it is clear from the record that respondent's current living situation was not adequate to care for two special-needs children, nor did she have any source of income—she was financially dependent on her husband, to whom she had been married less than a year and who was not the father of either child.

The trial court ultimately concluded that, although a bond might exist between respondent and her children, she was unable to provide them with appropriate care and keep them safe from injury or even death. In light of these facts, the trial court did not clearly err in determining that the termination of respondent's parental rights was in the children's best interests. *Olive/Metts*, 297 Mich App at 41-42. And although the trial court primarily made reference to JM's special needs when terminating respondent's parental rights, XM's own unique needs, and respondent's neglect of those needs, also support the trial court's decision; this case is thus distinguishable from *In re LaFrance*, 306 Mich App 713; 858 NW2d 143 (2014) (holding that the doctrine of anticipatory neglect did not justify termination of the respondents' rights to

her older, non-special-needs children when their rights to their youngest child with cerebral palsy were terminated based on medical neglect).

## IV. LACK OF REUNIFICATION SERVICES

Respondent also argues that the trial court erred by terminating her parental rights without giving due consideration to the fact that petitioner had not offered services to aid her in reunification with her children. We disagree.

Respondent correctly asserts that petitioner did not offer her reunification services. However, "[p]etitioner . . . is not required to provide reunification services when termination of parental rights is the agency's goal." *In re HRC*, 286 Mich App 444, 463; 781 NW2d 105 (2009). Under MCL 712A.19a(2)(a), efforts to reunify the family do not apply in cases where "[t]here is a judicial determination that the parent has subjected the child to aggravated circumstances as provided in . . . the child protection law . . . MCL 722.638." MCL 712A.19a(2)(a). MCL 722.638, which is incorporated by reference in MCL 712A.19a(2)(a), states that petitioner is permitted to seek termination without providing reunification services if a parent abuses a child by "[b]attering, torture, or other severe physical abuse," MCL 722.638(1)(a)(*iii*), "or is suspected of placing the child at an unreasonable risk of harm due to the parent's failure to take reasonable steps to intervene to eliminate that risk," MCL 722.638(2).

Petitioner sought termination of respondent's parental rights in the initial petition under a number of statutory bases. Most pertinent here are MCL 712A.19b(3)(b)(*i*) (parent caused physical injury to child or sibling of child), (b)(*ii*) (parent failed to prevent physical injury to child or sibling of child), and (k)(*iii*) (abuse included battery, torture, or other serious abuse). Again, respondent does not challenge the trial court's finding that these grounds were proven by clear and convincing evidence. The fact that petitioner sought to terminate respondent's parental rights under these criteria indicates that petitioner never intended for respondent to be reunified with JM and XM. JM was severely malnourished, almost to the point of death, and had a chronic subdural hematoma and decubitis ulcers, suggesting that he was severely abused and neglected over a lengthy period of time. It is unclear who was responsible for the subdural hematoma that JM sustained. However, regardless of whether respondent or another person was responsible for JM's head trauma, respondent was the sole provider of care and custody for the children, and either physically abused JM or failed to protect him from abuse. Therefore, petitioner was not required to offer reunification services to respondent, and the trial court did not clearly err by finding that termination was in the children's best interests. *HRC*, 286 Mich App at 463. Accordingly, respondent's claim is without merit.

Affirmed.


/s/ Brock A. Swartzle
/s/ Douglas B. Shapiro
/s/ Mark T. Boonstra